*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
September 25, 2024
3:05 PM

Plaintiff-Appellee,

v

No. 364847
Ingham Circuit Court
LC No. 21-000073-FC

TROY LEE JENKS,

Defendant-Appellant.

Before: RICK, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Following a jury trial, defendant was found guilty of second-degree murder, MCL 750.317. The trial court sentenced him to serve a term of imprisonment of 30 to 50 years. Defendant appeals as of right, arguing that insufficient evidence as to the lack of self-defense and presence of malice, the prosecutor's impermissible comments in closing argument, and ineffective assistance of counsel justify a new trial. He also argues that his jail credit was incorrectly calculated. We affirm.

## I. BACKGROUND

In the early morning hours of January 6, 2021, Darrell Leon Gaines was stabbed to death by defendant.

Gaines was in a casual sexual relationship with Adán Del Campo.[1] On the night of January 5, 2021, Del Campo invited defendant over to drink, smoke, and engage in three-way sexual relations. After several hours, Gaines became frustrated with defendant for "ruining the mood" and eventually told defendant to leave. Defendant refused to leave. He eventually approached

---

[1] The facts surrounding the stabbing are down entirely from Del Campo's testimony, which was largely undisputed.

-1-

Gaines, started hitting him,[2] and used racial slurs.[3] Gaines then grabbed defendant by the neck, at which point the two began "wrestling." The wrestling continued for an extended period, moving from the living room into the kitchen. While Del Campo did not see this, defendant at some point repeatedly stabbed and cut Gaines.[4] Defendant then fled, leaving his shirt behind; there was snow on the ground, and the temperature was in the low-to-mid 30s. Gaines walked outside and then fell to the ground before Del Campo called for help. Officers with the Lansing Police Department (LPD) arrived quickly, at approximately 2:00 a.m. Gaines was taken to the hospital and died shortly thereafter. Defendant was found that afternoon walking down the street with wet pants and wearing a garbage bag as a shirt. Defendant was arrested in front of his mother's house, where he told her that he was "going to prison."

Following a jury trial at which defendant argued self-defense, defendant was found guilty of second-degree murder. This appeal followed.

## II. ANALYSIS

### A. SUFFICIENCY AND GREAT WEIGHT OF THE EVIDENCE

Defendant argues that there was insufficient evidence presented that he acted with the requisite malice, and that he did not act in self-defense. He further argues that the guilty verdict was against the great weight of the evidence for the same reasons. We disagree.

"In challenges to the sufficiency of the evidence, this Court reviews the record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Roper*, 286 Mich App 77, 83; 777 NW2d 483 (2009). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). We will not interfere with the trier of fact's role of determining the weight of the evidence and the credibility of witnesses. *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). Moreover, "[c]ircumstantial evidence and reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of the crime." *Id*. "Minimal circumstantial evidence

---

[2] It is not clear from the record the precise manner in which defendant hit Gaines. Del Campo described the touching as more than "a tap," emphasizing that defendant "hit him pretty hard." Del Campo testified that defendant was "going like this," suggesting that he performed physical gestures to illustrate the contact to the jury.

[3] Gaines was black, and Del Campo testified that defendant, who is white, referred to him using the N-word.

[4] The autopsy of the victim revealed six stab wounds: four in the front, and two in the back. The stabs struck the victim's L-2 vertebrae and pierced his spleen and heart. The victim also had five incised wounds; the medical examiner explained that an incised wound is a cut that is longer than it is deep.

and reasonable inferences can sufficiently prove the defendant's state of mind, knowledge, or intent." *People v Miller*, 326 Mich App 719, 735; 929 NW2d 821 (2019).

"We review for an abuse of discretion a trial court's grant or denial of a motion for a new trial on the ground that the verdict was against the great weight of the evidence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009). "An abuse of discretion occurs when a trial court chooses an outcome falling outside the range of reasonable and principled outcomes." *Id*. "The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *Lacalamita*, 286 Mich App at 469. "Generally, a verdict may be vacated only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *Id*. "[T]he resolution of credibility questions is within the exclusive province of the jury." *Id*. at 470.

The elements of second-degree murder have traditionally been described as "(1) a death, (2) the death was caused by an act of the defendant, (3) the defendant acted with malice, and (4) the defendant did not have lawful justification or excuse for causing the death." *People v Smith*, 478 Mich 64, 70; 731 NW2d 411 (2007). Recently, this Court ruled "that the often-recited fourth element of second-degree murder, 'without justification or excuse,' actually is part of the 'cluster of ideas' of second-degree murder. It is not an element of the offense of second-degree murder." *People v Spears*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 357848); slip op at 12, oral argument gtd on the application ___ Mich ___; 6 NW3d 396 (2024).[5] This Court's "conclusion in this regard does not necessarily diminish the importance of the 'without justification or excuse' aspect of second-degree murder." *Id*. at 12 n 12.

"Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998). In the context of great bodily harm, this Court has stated, "Because of the difficulty in proving an actor's intent, only minimal circumstantial evidence is necessary to show that a defendant had the requisite intent." *People v Stevens*, 306 Mich App 620, 629; 858 NW2d 98 (2014). "Malice for second-degree murder can be inferred from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v Fletcher*, 260 Mich App 531, 559; 679 NW2d 127 (2004) (quotation marks and citations omitted). "Second-degree murder is a general intent crime." *Id*.

MCL 780.972(1) provides, in relevant part, as follows:

(1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another

_____

[5] Our Supreme Court has ordered oral argument in *Spears*, including on whether this is indeed an element. *People v Spears*, ___ Mich ___, ___; 6 NW3d 396, 396 (2024).

individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:

> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.

In *People v Bailey*, 330 Mich App 41, 46-47; 944 NW2d 370 (2019), this Court stated:

> A killing may be considered justified if the defendant acts in self-defense. Generally, an individual who is not the aggressor in an encounter is justified in using a reasonable amount of force against his adversary, but only if the individual believes that he is in immediate danger of bodily harm and that the use of force is necessary to avoid said danger. When a defendant raises the issue of self-defense, the defendant must satisfy the initial burden of producing some evidence from which a fact-finder could conclude that the elements necessary to establish a prima facie defense of self-defense exist. The prosecution is then required to exclude the possibility of self-defense beyond a reasonable doubt. [Citations and brackets omitted.]

There was sufficient evidence presented as to malice. Defendant does not argue that the stabbings were not intended to seriously injure, or even kill the victim. The uncontroverted evidence showed that defendant stabbed the victim six times, and that several of the stab wounds were quite deep. That is strong evidence of at least an intent to do great bodily harm.

Defendant is correct that certain evidence did support a self-defense claim. Del Campo testified that Gaines "grabbed" defendant by, or at least near, his neck. The struggle apparently lasted for about 20 minutes and was "rough." Gaines continued to grab defendant throughout the struggle. On the day of the stabbing, Del Campo told a police officer that he had thought the victim was going to kill defendant. Del Campo testified that he was "scared of the whole situation. It just got out of control." Finally, Gaines was approximately 6 inches taller than defendant.

However, the prosecution also presented several pieces of evidence indicating that this was not a case of self-defense. Del Campo testified that defendant was the initial aggressor, using racial slurs and hitting Gaines. Despite their height differences, defendant and Gaines were similar in age and weight. Defendant stabbed Gaines six times, including twice in the back, even though there is no evidence Gaines ever even possessed a weapon. Two of the stab wounds were deep enough to pierce his heart and spleen, and another was deep enough to cut through the muscle on Gaines's back and strike a vertebra. At trial, Del Campo did not describe the contact around defendant's neck area as anything more than a grab: it was not a "choke[]" or a "strangl[e]." There were no marks around defendant's neck when he was arrested, which supports a conclusion that the victim never exerted much pressure on defendant's neck. Moreover, Del Campo's description of the struggle lasting 20 minutes supports a finding that it would not have been reasonable for defendant to believe that he was about to be seriously harmed or killed when he finally stabbed the victim. Finally, while he did make a brief comment to the police that he feared Gaines would kill defendant, Del Campo has never testified to this. When testifying at trial, he indicated the opposite, testifying, "No, I didn't," when asked by the prosecutor, "You didn't expect anything to

happen, did you?" Further, he testified that he had not been scared of the victim. When a conviction is based on contradictory testimony, this Court must defer to the jury's decision unless the "testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it or [the testimony] contradicted indisputable physical facts or defied physical realities . . . ." *People v Lemmon*, 456 Mich 625, 645-646; 576 NW2d 129 (1998) (quotation marks and citation omitted).

Defendant's behavior after the killing also supports a finding that he did not act in self-defense. Defendant fled from Del Campo's home into cold weather, wearing little clothing. Despite that, 11 hours passed without him contacting police, seeking medical assistance, going to his home, or showing his face to anyone. This only ended when he finally did walk to his home, and the police found him. Finally, defendant told his mother that he was going to prison and asked her to tell "Hope" that he loved her. This consciousness of guilt evidence further supported a finding that he did not view the killing as justified.

For these reasons, a rational jury could have found that both malice and the lack of self-defense were proven beyond a reasonable doubt. See *Roper*, 286 Mich App at 83. For the same reasons, the verdict was not against the great weight of the evidence. The evidence as to malice strongly supports the verdict. While there was some evidence of self-defense, this evidence is not "so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *Lacalamita*, 286 Mich App at 469.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that his trial counsel was constitutionally ineffective for failing to seek suppression of statements defendant made while being arrested. We disagree.

Claims of ineffective assistance of counsel present mixed questions of fact and law. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). Factual findings are reviewed for clear error and legal conclusions are reviewed de novo. *Id*.

"To prevail on a claim of ineffective assistance, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability exists that the outcome of the proceeding would have been different but for trial counsel's errors." *Head*, 323 Mich App at 539 (quotation marks, citation, and alteration omitted). "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). This Court presumes counsel was effective, and defendant carries a heavy burden to overcome this presumption. *Head*, 323 Mich App at 539. "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 US at 690. This Court then evaluates "whether the trial attorney's acts or omissions were outside the wide range of professionally competent assistance." *People v Green*, 322 Mich App 676, 684; 913 NW2d 385 (2018) (quotation marks and citation omitted).

In this case, the police found defendant outside his mother's home and promptly placed him in handcuffs. Prior to taking him to jail, the police allowed him to smoke a cigarette and speak with his mother. Defendant then made statements to his mother that the prosecution used against

him as evidence of consciousness of guilt. On appeal, defendant argues that the police violated his *Miranda*[6] warnings because allowing defendant's mother to speak with him while he smoked a cigarette was likely to elicit incriminating statements. Therefore, defendant argues, defense counsel's failure to seek exclusion of these statements constituted ineffective assistance of counsel.

The Unites States Constitution and the Michigan Constitution both protect the right against self-incrimination. US Const, Am V; Const 1963, art 1, § 17. In *Miranda v Arizona*, 384 US 436, 444-445; 86 S Ct 1602; 16 L Ed2d 694 (1966), the United States Supreme Court established a procedural safeguard designed to offer additional protection for this right. "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless" the defendant was first informed of certain constitutional rights, including the right to remain silent. *Id*. at 444. "Once a suspect invokes his right to remain silent . . . , police questioning must cease unless the suspect affirmatively reinitiates contact." *People v Tanner*, 496 Mich 199, 208; 853 NW2d 653 (2014). The right to remain silent can be asserted at any time, but the assertion of this right "must be unequivocal." *People v Henry (On Remand)*, 305 Mich App 127, 145; 854 NW2d 114 (2014). After the right has been asserted, "the police must 'scrupulously honor' the defendant's request." *Id*. (citation omitted). These "warnings provide an implicit promise that a defendant will not be punished for remaining silent. Once the government has assured a person of his right to remain silent, breaching the implied assurance of the *Miranda* warnings is an affront to the fundamental fairness that the Due Process Clause requires. *People v Shafier*, 483 Mich 205, 213; 768 NW2d 305 (2009) (quotation marks and citation omitted). Therefore, statements made by a defendant during an interrogation after the defendant invoked the right to remain silent are inadmissible in court. *People v Adkins*, 259 Mich App 545, 564; 675 NW2d 863 (2003).

" 'Interrogation,' as conceptualized in *Miranda*, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v Innis*, 446 US 291, 300; 100 S Ct 1682; 64 L Ed 2d 297 (1980). "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 300-301. "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Id*. at 301. "But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id*. at 301-302.

Defendant's argument fails for several reasons. A *Miranda* violation can be established if a custodial interrogation is initiated without informing the defendant of his or her rights or if a custodial interrogation continues after the defendant invokes his or her rights. In this case, there is nothing in the record suggesting that the police did not tell defendant his rights after placing him

---

[6] *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

in custody but before letting him speak with his mother. There also is nothing in the record suggesting that defendant invoked his right to remain silent. Finally, the police did not do anything that they should have known was reasonably likely to evoke an incriminating statement.

In conclusion, defendant has not established ineffective assistance arising from the failure to seek exclusion of these statements pursuant to *Miranda* because defense counsel is not ineffective for failing to pursue a futile motion. *People v Goodin*, 257 Mich App 425, 433; 668 NW2d 392 (2003).

## C. PROSECUTORIAL MISCONDUCT

Defendant argues that the prosecutor committed misconduct, requiring a new trial, by arguing facts not in evidence and disparaging defense counsel. Alternatively, he argues that his defense counsel was constitutionally ineffective for failing to object to these closing arguments. We disagree.

To preserve an issue of improper prosecutorial argument, a defendant must make "a timely, contemporaneous objection and request for a curative instruction." *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003). At trial, defendant raised no objection to any part of the prosecutor's closing argument. He also did not contest this lack of objection as ineffective assistance of counsel. Therefore, this issue is not preserved.

Claims of prosecutorial misconduct are reviewed de novo. *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013). However, unpreserved claims of prosecutorial misconduct are reviewed for plain error. *People v Evans*, 335 Mich App 76, 88; 966 NW2d 402 (2020). A plain error occurs if three requirements are "met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (citation omitted). Even if the three requirements are met, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* at 763 (quotation marks, citation, and alteration omitted).

"During a criminal trial, prosecutors serve truth and justice first. The job isn't just to win, but to win fairly, staying well within the rules." *People v Urbanski*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (quotation marks and citation omitted) (Docket No. 359011); slip op at 5. Prosecutorial misconduct claims are reviewed on a case-by-case basis. *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017). "The test for prosecutorial misconduct is whether the defendant was deprived of a fair trial." *People v Orlewicz*, 293 Mich App 96, 106; 809 NW2d 194 (2011). "The cumulative effect of several minor errors may warrant reversal even where individual errors in the case would not. Reversal is warranted only if the effect of the errors was so seriously prejudicial that the defendant was denied a fair trial." *People v McLaughlin*, 258 Mich App 635, 649; 672 NW2d 860 (2003) (citation omitted). "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements and jurors are presumed to follow their instructions." *Unger*, 278 Mich App at 235 (citation omitted). Unpreserved claims of

prosecutorial misconduct will not warrant reversal unless a curative instruction would have been insufficient to alleviate the harm caused by the misconduct. *Id.*

## 1. DENIGRATION OF DEFENSE COUNSEL

Defendant's argument that the prosecutor improperly denigrated defense counsel is without merit because the prosecution's comments were directed at counsel's arguments, not counsel herself.

"A prosecutor is afforded great latitude regarding his or her arguments and conduct at trial"; however, "the prosecutor may not suggest that defense counsel is intentionally attempting to mislead the jury." *People v Fyda*, 288 Mich App 446, 461; 793 NW2d 712 (2010).

> The prosecutor may not question defense counsel's veracity. When the prosecutor argues that the defense counsel himself is intentionally trying to mislead the jury, he is in effect stating that defense counsel does not believe his own client. This argument undermines the defendant's presumption of innocence. Such an argument impermissibly shifts the focus from the evidence itself to the defense counsel's personality. *Unger*, 278 Mich App at 236 (quotation marks and citation omitted).

Moreover, "[a] prosecutor cannot personally attack the defendant's trial attorney . . . ." *People v Kennebrew*, 220 Mich App 601, 607; 560 NW2d 354 (1996). Such arguments tend to undermine the presumption of innocence. *Fyda*, 288 Mich App at 461. However, "otherwise improper remarks by the prosecutor might not require reversal if they respond to issues raised by the defense." *People v Callon*, 256 Mich App 312, 330; 662 NW2d 501 (2003). Accordingly, "a prosecutor's comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *Callon*, 256 Mich App at 330. Moreover, prosecutors "need not confine argument to the blandest possible terms." *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007).

The prosecutor argued that certain aspects of defendant's case were "blue smoke and mirrors." To the extent defendant argues that the prosecutor was personally disparaging his attorney, this is plainly without merit because the prosecutor was clearly attacking the attorney's arguments, not the attorney herself. To the extent defendant argues that the prosecution accused defense counsel of intentionally misleading the jury, defendant overstates the strength of the prosecutor's statements: he did not apply that description to the entire defense case. The prosecutor used that phrase only in reference to certain evidence and arguments. The prosecutor was arguing that the following defense arguments were irrelevant to the key disputes involved in the case: that the victim arguably told Del Campo to go back into the house, that the crime scene was not preserved in the proper way, and that the victim had used drugs. The first statement to which defendant objects, in whole, was as follows:

> The fact that Mr. Gaines says to Mr. Del Campo [sic] "Get back" and Mr. Del Campo goes back in the house, I—maybe that's how he heard it, maybe he just coincidentally went back in the house. That's not an element. It's blue smoke and mirrors, like the Aaron Bush contamination of the jersey, and the drugs, and—I don't know.

Subsequently, the prosecution stated:

> So beyond the blue smoke and mirrors of evidence collection and the tampering or contamination or whatever the heck they want to call it that [sic]— you'll hear—they're free to say what they want. I submit to you it isn't part of the case, it's not an element, it doesn't do anything, but I submit it wasn't a perfect situation.

The prosecutor was free to attack defendant's arguments, and he was free to do so with strong, passionate language. "He may prosecute with earnestness and vigor—indeed, he should do so." *Berger v United States*, 295 US 78, 88; 55 S Ct 629; 79 L Ed 1314 (1935). Accordingly, the prosecutor was well within his rights to call out arguments he viewed as fallacious and distracting. He was likewise well within his rights to do so using strong language and idioms such as "smoke and mirrors." When viewed in context, these statements were reasonable attacks against arguments that did not go so far as to suggest that defense counsel did not believe her client or was lying to the jury. Therefore, this argument is without merit.

## 2. FACTS NOT IN EVIDENCE

Defendant's argument that the prosecutor improperly made arguments based on facts that were unsupported by the evidence is without merit because the prosecutor's comments were based on reasonable inference that could be drawn from the evidence.

"Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial. They are generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008) (citation omitted). However, "[a] prosecutor may not make a factual statement to the jury that is not supported by the evidence, but he or she is free to argue the evidence and all reasonable inferences arising from it as they relate to his or her theory of the case." *Dobek*, 274 Mich App at 66 (citations omitted).

Defendant takes exception to comments that the prosecution made regarding defendant's conduct during the hours after the stabbing. The prosecutor stated that the weather report indicated it had been "36 degrees and this north wind, 5 miles per hour." He stated that

> for 11 hours or so, apparently [defendant] was running around Lansing wearing a garbage bag for a shirt. Who does that? Who doesn't go to someone's house in the middle of the night and go "Hey, man, somethin' just went sideways down the street. I need you to call 911 for me. I had to act in self-defense." Who doesn't go home and go to sleep? Who doesn't go to a business? Where was he?

The prosecutor played 2 minutes of body camera footage of Officer Moore, showing the victim outside the home. The prosecutor stated:

> [T]here's three people in the house. One is deceased, one is out running around Lansing with a garbage bag for a shirt, and you can hear how quickly LPD responds, and you can hear the sirens, and I think a conclusion can be made by the flinging

out the back door and the hearing of sirens that he beat foot and went and hid. He didn't run to help. He ran away from help, okay?

The prosecutor stated defendant was "in the dumpster wearing a garbage bag and running around Lansing in it." The prosecutor stated:

> What wasn't there? Him. He's gone, running around in a garbage bag for upwards of 11 hours in 36 degrees and 5 mile per hour winds coming from the north. It doesn't make sense, man. It doesn't make sense. And the only way it makes sense is he knew what he did, which is why when his mom comes out, he yells, "I'm going to prison."
>
> \* \* \*
>
> And he says—Mom says—again, while the body cam is on, she says, "What happened?" or "What's going on?" and he says, "It had to be bad. They rushed up on me." . . .
>
> For all he knew at the time, he's being taken into custody 'cause he's running around north Lansing for the past 11 hours wearing a garbage bag, or he was somewhere he shouldn't have been, maybe, and was trespassing. But the guilty conscience—the guilty mind came out at that point when he says, "Tell Hope I love her," "Mom, I love you," and "I'm going to prison."

The prosecutor stated that defendant "apparently was running around Lansing and jumping fences and digging around dumpsters or something, right? I don't know how many people have ever jumped fences, run around trees, scratches. Maybe those were [the victim's] marks. There were marks from [the victim] on [defendant's] torso." During rebuttal, the prosecutor argued:

> You need to look at the post-crime conduct. He didn't do anything. He wasn't running around Lansing with a garbage bag for 11 hours. When he hears sirens, he's running away from them, not running towards them. When approached by Lieutenant Baldwin, he's not saying, "Thank God, police. Guess what just happened to me almost 12 hours ago." Nope. "I'm going to prison." Why, if he didn't do it, would he tell his mom he was going to prison? . . .
>
> \* \* \*
>
> And when he had an opportunity when he scurried out and fled from that back door and you can hear sirens in the background and you see lights flashing from police cars, he ran away from 'em. And when he got found 11 hours later by police, he didn't say, "God, thank you for comin' and helping me. You won't believe what just happened."

The assertion that defendant was "running around in a garbage bag for upwards of 11 hours" was supported by the evidence. It is undisputed that defendant fled the house immediately after stabbing Gaines, that he was found outside his mother's house 11 hours later, that his pants were wet, and that he was wearing a garbage bag as a shirt. The prosecution's statement was an

inference that reasonably follows from this evidence. The prosecution's assertion that defendant was fleeing while he could hear sirens and see police lights were reasonable inferences supported by the evidence. There was evidence that the police arrived at the house very quickly after being summoned and that defendant was promptly taken to the hospital. It can be reasonably inferred that the police cars and ambulance used their lights and sirens. Because defendant left on foot in the middle of the night, it likewise follows that he would have heard and seen the sirens and lights. Finally, defendant argues that the prosecution made unsupported comments regarding how defendant's behavior was inconsistent with his self-defense argument. However, jurors are encouraged to rely on their common sense and intuition when interpreting the evidence, and the prosecution was calling on the jurors to rely on their common sense and intuition when thinking about whether defendant's behavior was consistent with his defense.

In sum, the prosecutor's comments fell within the "great latitude" afforded him, *Unger*, 278 Mich App at 236, and were based on "reasonable inferences that may arise from the evidence," *Callon*, 256 Mich App at 330.

Because the prosecutor's challenged closing arguments, even considered collectively, do not amount to misconduct, defense counsel was also not constitutionally ineffective. See *Putman*, 309 Mich App at 245 ("[C]ounsel is not ineffective for failing to raise meritless or futile objections.").

## D. JAIL CREDIT

Defendant argues that his jail credit should have included days spent on house arrest.[7] However, defendant concedes that this argument has been squarely rejected by multiple published opinions of this Court. *People v Smith*, 195 Mich App 147, 152; 489 NW2d 135 (1992); *People v Reynolds*, 195 Mich App 182, 184; 489 NW2d 128 (1992).[8] Defendant, without requesting that we declare a conflict and request convention of a special panel,[9] argues that these cases were wrongly decided. Even had defendant requested that we do so, we decline to ask the rest of this Court to uproot 32 years of binding precedent, and we instead leave defendant to seek relief in the Supreme Court.

Affirmed.

/s/ Michelle M. Rick
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado

---

[7] "Whether a defendant is entitled to credit for time served in jail before sentencing is a question of law that we review de novo." *People v Armisted*, 295 Mich App 32, 49; 811 NW2d 47 (2011).

[8] "A panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals issued on or after November 1, 1990, that has not been reversed or modified by the Supreme Court, or by a special panel of the Court of Appeals as provided in this rule." MCR 7.215(J)(1).

[9] See MCR 7.215(J).